# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs January 15, 2014

## STATE OF TENNESSEE v. DUSTIN MARK VAUGHN

**Direct Appeal from the Circuit Court of Bedford County**
**No. 17560     Robert Crigler, Judge**

---

**No. M2013-01179-CCA-R3-CD - Filed May 12, 2014**

---

Defendant, Dustin Mark Vaughn, entered guilty pleas to the promotion of methamphetamine manufacture and the initiation of the process to manufacture methamphetamine. After a sentencing hearing, the trial court sentenced Defendant to concurrent sentences of four years for the promotion of methamphetamine manufacture conviction and twelve years for the methamphetamine initiation process conviction. The trial court denied Defendant's request for alternative sentencing. On appeal, Defendant argues that the trial court erred by denying his request for alternative sentencing. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROBERT W. WEDEMEYER, J., joined.

Donna Orr Hargrove, District Public Defender; Michael J. Collins and Andrew Jackson Dearing, III, Assistant Public Defenders, Shelbyville, Tennessee, for the appellant, Dustin Mark Vaughn.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Robert Carter, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Background

At the guilty plea submission hearing, the prosecutor provided a summary of the State's evidence to support the guilty pleas:

The factual basis occurred on August 9, 2011.

The Drug Task Force received a call from Wal-Mart that the defendant had just purchased a box of pseudoephedrine.

A couple of agents from the task force went there. They were familiar with the defendant. They knew he was one to be a manufacturer of meth.

So they went there. They saw the defendant in a vehicle. They ultimately conducted a traffic stop of the vehicle. A girl driving it. They ultimately released her from the scene. They asked the defendant - - during the course of the stop they saw the box of pseudoephedrine. They asked the defendant what that was for. He said you know what it is for.

So they asked if he would ride with them back to his residence and he agreed. They went back to the place where he was staying at the time; conducted a consensual search. In his room they found a plastic container containing a white residue suspected of being methamphetamine residue.

In a barn located on the property they found a wood burning stove with remnants of lithium batteries, an empty box of Sudafed; an empty one liter size bottle of Coleman fuel; one pound container of sodium hydroxide and bottle caps and tubing that had obviously been fashioned to be part of a gasser.

The defendant was interviewed about his making of methamphetamine.

At the sentencing hearing , the State presented the pre-sentence report which was admitted as an exhibit. Special Agent Shane George of the 17th Judicial Drug Task Force testified that he had been a member of the Drug Task Force for approximately fourteen years. He stated that during the past five years, approximately eighty-percent of his cases were "meth-related offenses." Concerning his training and experience in investigating methamphetamine (meth) related crimes, Special Agent George testified:

I believe it was the end of 2002, I attended the initial certification at the Hamilton County Sheriff's Office - - it was put on by the Tennessee Meth Task Force - - wherein I spent 40 hours there learning how to handle the numerous dangerous chemicals and reactions that take place during meth production; and also learned a number of different manufacturing methods that were in use heavily at the time.

Since that date, I have attended no less than eight hours a year of recert[ification] training, update training, learning about new trends in the meth production.

In addition to that, I have interviewed hundreds of people that were in some way involved in meth production, be it the person that is just going around gathering up the chemicals or the precursors, all of the way to the individuals that are actually manufacturing the methamphetamine themselves.

I've arrested probably hundreds of people that are involved in that activity and prosecuted at least 100 people during that time.

Special Agent George also noted that he was certified to separate the components of a meth lab and to identify the "components, make the area safe." He said that he was also certified to break a lab "down to a certain degree."

Concerning the meth problem in the 17th Judicial District, Special Agent George testified:

It has had its ups and downs, [ ]. When we started - - when I started 14 years ago, it was booming. The red P and the nazi were the methods of choice. It was really running rampant.

They had a slowdown probably about six or seven years ago when they implemented the precursor watch. What that is, is you have to go in and actually sign for the pseudoephedrine tablets. You have to present an ID. And they were limiting the number of grams that you could actually purchase in a 30-day period.

There has been some updates in the laws on that here recently, and they have buckled down on it still significantly more, but it is still running rampant. Especially with this new process, it's much more simplified. There's - - even

though there is still an inherent danger of explosion and chemical exposure, it is not quite what it used to be.

The meth cooks and what is commonly referred to as the smurfer, the person that's actually going out and getting the box of pseudoephedrine, they are finding ways to circumvent the system, be it using someone else's ID fraudulently or actually purchasing the pseudoephedrine, cutting open the box very carefully, removing the controlled pseudoephedrine tablets out of it and replacing it with an uncontrolled tablet blister pack, resealing it, and taking it back to the pharmacy and returning it so it doesn't actually show up as a purchase on their history.

They are figuring out all kinds of way[s] to circumvent the system. And again, it's booming. It's back.

Special Agent George felt that there was still a significant problem with methamphetamine in the 17th Judicial District. He also testified that there was a need to deter individuals from acquiring the ingredients to make methamphetamine.

In Special Agent George's opinion, incarceration provided an effective deterrent to the "meth problem." He testified:

I have interviewed a number of individuals that have gone, both state and federal, looking at significant periods of time. And quite frankly, they were very distraught over the prospect of having to spend time behind bars, extended periods of time behind bars because it was going to keep them away from the drug.

The drug is very addictive. It grabs ahold [sic] of these people and it won't let them go. I see it time and time again, the reoffenders. They continue to reoffend. They continue to get out and seek the drug out.

And quite frankly, if you give them enough time they are going to figure out how to cook the stuff because it is so - - as I stated earlier, it is so simplified, the process is, right now.

Special Agent George testified that he had previously arrested Defendant and recovered several items used to manufacture methamphetamine. Defendant was then placed on probation in general sessions court. Special Agent George testified that a short time later, Defendant "came back up on the radar hot and heavy." He said from information that he had

gathered since Defendant's initial arrest in 2010 through the arrest for the current offenses, and while Defendant was released on bond, he had not stopped manufacturing methamphetamine.

Michael Jones testified that Defendant's grandfather was Mr. Jones' step-brother. He said that Defendant had lived with him at 340 Old Pencil Mill Road in Chapel Hill for the past fourteen years. Mr. Jones testified that Defendant's mother was addicted to crack cocaine and that Defendant was born a "crack addict." He noted that Defendant had never had a job "because he can't even fill out an application. His mental ability is nearly nil." Mr. Jones testified that no one had tried to help Defendant get "some kind of assistance. He has no hospitalization, no like insurance, no nothing."

Mr. Jones felt that Defendant could complete a program with intensive probation and "harsh conditions." He also testified that Defendant needed a job. Mr. Jones testified that if Defendant were given a "break," he would turn Defendant into authorities if he found out that Defendant was again using marijuana, cocaine, or methamphetamine.

## II.  Analysis

Defendant contends that the trial court erred in denying his request for alternative sentencing. We disagree.

In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 709 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer,* 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore,* 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.* at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court imposes a sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

Our Supreme Court extended the *Bise* standard to appellate review of the manner of service of the sentence. The Court explicitly held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). We are also to recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2010).

With regard to alternative sentencing, Tennessee Code Annotated section 40-35-102(5) (2010) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

A defendant who does not fall within subdivision (5) of Tennessee Code Annotated section 40-35-102, "and who is an especially mitigated offender or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." T.C.A. § 40-35-102(6). Generally, defendants classified as Range II or Range III offenders are not to be considered as favorable candidates for alternative sentencing. T.C.A. § 40-35-102(6). Additionally, we note that a trial court is "not bound" by the advisory sentencing guidelines; rather, it "shall consider" them. T.C.A. § 40-35-102(6) (emphasis added).

Even if a defendant is a favorable candidate for alternative sentencing under Tennessee Code Annotated section 40-35-102(6), a trial court may deny an alternative sentence because:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103.

A defendant is not eligible for probation, whether full probation, split confinement, or periodic confinement, unless he is sentenced to serve ten years or less. Tenn. Code Ann. § 40-35-303(a)(2013 Supp.). The effective concurrent sentence of twelve years therefore makes Defendant ineligible for probation, and results in the only available form of alternative sentence to be community corrections.

Being sentenced to community corrections is not an entitlement. *State v. Grigsby*, 957 S.W.2d 541, 547 (Tenn. Crim. App. 1997) ( "The Community Corrections Act was never intended as a vehicle through which offenders could escape incarceration."). The Community Corrections Act was meant to "[e]stablish a policy within the state to punish selected, nonviolent felony offenders in front-end community based alternatives to incarceration, thereby reserving secure confinement facilities for violent felony offenders [.]" Tenn. Code Ann. § 40-36-103(1) (2006); *see also State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001). Pursuant to statute, persons who satisfy all of the following minimum criteria are eligible for participation in a community corrections program:

> (A) Persons who, without this option, would be incarcerated in a correctional institution;
>
> (B) Persons who are convicted of property-related, or drug or alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;

(C) Persons who are convicted of nonviolent felony offenses;

(D) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;

(E) Persons who do not demonstrate a present or past pattern of behavior indicating violence; [and]

(F) Persons who do not demonstrate a pattern of committing violent offenses.

Tenn. Code Ann. § 40-36-106(a)(1)(A)-(F) (2006). However, persons who are sentenced to incarceration or who are on escape at the time of consideration will not be eligible, even if they meet these criteria. *See* Tenn. Code Ann. § 40-36-106(a)(2) (2006).

Even though an offender meets the minimum requirements for eligibility, he or she is not automatically entitled to participation in a community corrections program. *See State v. Ball*, 973 S.W.2d 288, 294 (Tenn. Crim. App. 1998); *State v. Taylor*, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987). Rather, the Act provides that the criteria shall be interpreted as minimum standards to guide a trial court's determination of whether that offender is eligible for community corrections. *See* Tenn. Code Ann. § 40-36-106(d) (2006).

At the sentencing hearing, the trial court reviewed all of Defendant's prior convictions, beginning at the age of 18, and noted that he had violated probation on numerous occasions. The trial court also made the following findings:

This is a pretty lengthy record. Lots of probation violations. Frankly, I believe a 12-year sentence is called for in this case on count 2, and the 4-year sentence on count 1.

The argument to give him a chance, he has been given chances over and over and over again. That sounds good, but just defies all of the facts in this case.

You have to consider alternative sentencing. In making that determination, the Court is to look at whether confinement is needed to protect society by restraining a defendant who has a long history of criminal conduct. It is clear that he does. It covers his entire life.

Whether confinement is particularly suited to provide an effective deterrent to people likely to commit similar offenses. The Court finds that - - accredits Agent George's testimony that, that it also requires incarceration.

And then less restrictive measures of confinement have frequently or recently been applied unsuccessfully to the defendant, and both of those are true as well.

Furthermore, he is a poor candidate for probation, even - - or community corrections. As Mr. Jones said, he can't fill out an application or hold a job, and he could not successfully complete probation.

So the Court is going to - - and he is a dropout. He's never held a job before. So he could not complete community corrections or probation.

*       *       *

Meth is a dangerous problem and if I let him stay out any longer and he OD'd or something, I would never forgive myself. And that seems to be a pretty likely possibility in this case.

The record supports the trial court's denial of alternative sentencing for Defendant based on deterrence, Defendant's criminal history, and his repeated failure to comply with sentences involving probation. According to the presentence report, Defendant had prior convictions for DUI, second offense, public intoxication, driving without a license, simple possession of drugs, unlawful drug paraphernalia uses and activities, violation of the implied consent law, simple possession of cocaine, evading arrest, failure to report an accident, involved driver failure to stop at the scene of an accident, sale of cocaine, two convictions for violation of legend drug law statutes, possession of alcohol by an underage person, contributing to the delinquency of a minor, and two theft convictions. Defendant violated probation at least five times, and he was on probation when he committed the offenses in this case.

We conclude that the sentencing decision was in compliance with the purposes and principles listed by statute. *Bise*, 380 S.W.3d at 709-10. Defendant is not entitled to relief.

Accordingly, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE